UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GABRIEL OLIVAREZ,

        Petitioner,

  vs.

RALPH DIAZ,

        Respondent.

No. 2:13-cv-1046-KJM-EFB P

FINDINGS AND RECOMMENDATIONS

      Petitioner is a state prisoner proceeding without counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges a judgment of conviction entered against him in the San Joaquin County Superior Court on charges of first degree murder, attempted murder, and being a felon in possession of a firearm, with various firearm sentence enhancements. He seeks federal habeas relief on the grounds that the evidence introduced at his trial is insufficient to support his conviction and his appellate counsel rendered ineffective assistance. Upon careful consideration of the record and the applicable law, the undersigned recommends that petitioner's application for habeas corpus relief be denied.

**I. Background**

      In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

1

Defendant arrived at what was to be a fistfight between two men over a woman. Just as the fight began, he pulled out a gun and fired eight times, first wounding Efren Chavira and then killing his younger brother Diego. The only evidence identifying defendant as the shooter was the testimony of two other men present at the fight.

* * *

**FACTS**

Ben Callaway had a child with his former girlfriend, Michelle Zuloaga. Although they had been separated for three years, Callaway and Zuloaga maintained a friendly relationship and Callaway had visitation with his son. Callaway lived with Carlos Munoz, who was Zuloaga's cousin. The two men were close and called each other "cousin."

On Easter Sunday, Zuloaga went to a family barbeque with her boyfriend, Nelson Chavira.[1] When Callaway came by to pick up his son, there was an altercation with Zuloaga's uncle, who did not want Callaway on his property. That night, after returning home, Zuloaga and Nelson got into an argument and Nelson hit Zuloaga. She told him to get out and her sister drove Nelson home. Zuloaga called Callaway and complained about Nelson hitting her.

Nelson, who was upset about Zuloaga's relationship with Callaway, also called Callaway. His purpose in calling was to "squash it" or handle their business. After several calls where Nelson challenged Callaway, they agreed to meet to fight. Callaway testified he was ignoring Nelson's challenges until Nelson mentioned Callaway's son. Although they intended to fight one-on-one, Nelson asked his brothers, Efren and Diego, to come and back him up. All three armed themselves with knives or a corkscrew.

Munoz readily volunteered to join Callaway since it was clear that more than one person would be at the fight. Concerned about a fair fight, Munoz also called Ruben Carrillo, telling him that his cousin was about to fight and to meet them. Carrillo agreed. Callaway claimed Munoz did not tell him about the call to Carrillo until they arrived at the fight.[2]

The group met in a Safeway parking lot. Callaway and Munoz arrived in a silver Mercedes, Carrillo and defendant in a blue SUV; the three Chavira brothers came on foot. Callaway headed towards the brothers, asking, "Who's Nelson?" Nelson identified himself. Nelson threw a punch at Callaway and Callaway ducked. Suddenly shots rang out, eight in all.

---

[1] Because the three Chavira brothers share the same last name, we refer to brothers Nelson, Efren, and Diego Chavira by their respective first names.

[2] Carrillo pled guilty to being an accessory (Pen.Code, § 32) and possession of a firearm by a felon (Pen.Code, § 12021, subd. (a)). The plea bargain did not require him to testify.

2

> Just before the shooting, Efren noticed a man (later identified as defendant Gabriel Isidore Olivarez) with a hood over his face and gloves on, with a gun in his hand. Efren asked him, "Why you got to come like that?" meaning why did he have a gun. Defendant then shot Efren in the chest. Efren suffered wounds to his stomach and his arm was broken, requiring a metal rod and seven screws. Defendant continued to fire and hit Diego in the arm, thigh and back – the fatal shot.
>
> Callaway and Munoz ran back to the Mercedes and left. The SUV also left. On the way home, Munoz called Carrillo and asked, "What the fuck? Why you guys do that for?" He heard defendant in the background say, "It's either going to be me or them." Carrillo and defendant went to Munoz's house and told Munoz and Callaway that everything would be okay if everyone kept their mouths shut.[3] Defendant said he had seen someone with a weapon and it would be "them before me." He admitted he knew that he had shot someone twice in the chest.
>
> The jury found defendant guilty of first degree murder (Pen.Code, § 187) and attempted murder (Pen.Code, §§ 664/187), both with various firearm enhancements (Pen.Code, § 12022.53, subds.(b), (c), and (d)), and being a felon in possession of a firearm (Pen.Code, § 12021, subd. (a)). In a bifurcated proceeding, the court found defendant had a strike prior (Pen.Code, §§ 667, subd. (d); 1170.12, subd. (b)) and two prior prison terms (Pen.Code, § 667.5, subd. (b)). Defendant was sentenced to 118 years to life in prison.

*People v. Olivarez*, No. C065061, 2012 WL 243196, **1-2 (Cal.App. 3 Dist. January 26, 2012).

After petitioner's judgment of conviction was affirmed by the California Court of Appeal, he filed a petition for a writ of habeas corpus in the California Supreme Court. Resp't's Lodg. Doc. 14. Therein, he raised for the first time the claims that he raises in the petition before this court. *Id.* The California Supreme Court summarily denied that petition by order dated April 10, 2013. Resp't's Lodg. Doc. 15.

/////

/////

/////

---

[3] Munoz testified about this meeting at trial. Callaway told detectives about it in his second interview. At trial, Callaway testified he let Carrillo in the house and then went back upstairs. He denied he spoke with Carrillo and defendant. When impeached with his interview, Callaway claimed he told the detectives only what he had learned from Munoz and Detective Silva. There is no Detective Silva in the San Joaquin Sheriff's Department.

**II. Standards of Review Applicable to Habeas Corpus Claims**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S. ___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,

be accepted as correct. *Id.* Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[4] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 412. *See also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86,___,131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*,131 S. Ct. at 786-87.

/////

---

[4] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

5

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784-85. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, ___ U.S. ___, ___, 133 S.Ct. 1088, 1091 (2013).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 786. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Richter*, 131 S. Ct. at 784).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

**III. Petitioner's Claims**

    **A. Sufficiency of the Evidence**

In his first ground for relief, petitioner claims that the evidence introduced at his trial was insufficient to support his convictions for murder and attempted murder. ECF No. 1 at 3-22.[5] He argues that the prosecutor failed to prove the charges against him beyond a reasonable doubt because there was significant evidence demonstrating that Munoz, and not he, was the shooter. *Id.* Petitioner notes that the only evidence against him was the testimony of Ben Callaway and Carlos Munoz, who petitioner characterizes as a "police informant." *Id.* at 4-5, 25. Petitioner argues that Munoz's statements to police implicating him were untruthful and that the police and prosecutor knew this when Munoz "falsely implicated Petitioner as being the shooter." *Id.* at 6.

/////

/////

---

[5] Page number citations such as this one are to the page numbers reflected on the court's CM/ECF system and not to page numbers assigned by the parties.

1    Petitioner argues that the trial testimony of Efren Chavira established that Munoz was the
2    shooter. *Id.* He notes that Efren Chavira informed the police and testified at trial that the "man
3    with the gun," or the shooter, exited a Mercedes Benz at the scene. *Id.* at 6, 8, 27, 31. He points
4    out that Munoz testified he arrived at the crime scene with Ben Callaway in a Mercedes Benz. *Id.*
5    at 5-6, 28. In addition, Munoz testified that after exiting the Mercedes he "squared off" with a
6    man who was wearing red shorts. *Id.* at 5-6, 29. Efran Chavira testified he was wearing red
7    basketball shorts at the scene. *Id.* at 7, 30. Thus, petitioner argues that the following facts are
8    "undisputed":

> 1. Carlos Munoz arrived at the crime scene in a Mercedes Benz.
>
> 2. Efren Chavria [sic] was squared off with a person who exited the Mercedes Benz.
>
> 3. Carlos Munoz was squared off with someone wearing red shorts.
>
> 4. The only person wearing red shorts during the incident was Efren Chavria [sic].

*Id.* at 9. Given these "undisputed facts," petitioner argues that "the detectives knew or should
have known that Efren Chavira had positively identified (and correctly identified) Carlos Munoz
as being the shooter in the case." *Id.* at 10. Petitioner also argues that "it was the prosecution's
theory that there was only one (1) shooter, so if Mr. Munoz was responsible for shooting Mr.
Chavira he would also be responsible for shooting and killing Mr. Chavira's brother, Diego
Chavira." *Id.* at 9. He claims that the police were aware that their "informant," Munoz, was
responsible for the shooting, but that they "simply ignored the evidence" and "freely disregarded
Mr. Chavira's positive identification." *Id.* at 9, 10.

At set forth above, Efren Chavira told police prior to petitioner's trial that the shooter
exited a Mercedes Benz. In spite of this, petitioner was charged with the shootings, even though
he arrived at the scene in a different car. Petitioner's trial counsel cross-examined the police
detective about why he did not pursue this seeming contradiction, when he knew that the only two
occupants of the Mercedes Benz were Munoz and Callaway. *Id.* at 11. Specifically, the
following testimony occurred:

8

Q: (by Mr. Goss, petitioner's trial counsel): You were present during those statements made by Efren Chavira; is that correct?

A. (by the interrogating police officer): I was.

Q. And you knew at that point that the only two occupants of the Mercedes Benz were Carlos Munoz and Ben Callaway, true?

A. I was. But when me and detective –

Q. No, no. The question requires a "yes" or "no" answer. You knew at that point that the only two occupants of the Mercedes Benz were Carlos Munoz and Ben Callaway, right?

A. I was.

Q. Following the statement provided by Efren Chavira, did you follow up by reinterviewing either Ben Callaway or Carlos Munoz?

A. We did not.

MR. GOSS: No further questions.

THE COURT: Thank you, officer.

MS. DOBBERT (the prosecutor): No, wait, wait, wait.

Q: (by the prosecutor): Why didn't you follow up?

A. Me and Detective Gardiman had discussed it. And during our discussion, we realized that based on descriptions, he had mixed up the cars.

MR. GOSS: Objection. This is conjecture on the part of this witness.

THE COURT: That's why they didn't follow up. This isn't for the truth of anything. He's just answering why he didn't follow up.

MR. GOSS: He's making a statement that that's what the facts are. He can give an opinion, but he can't say the facts. And that's my –

THE COURT: He's just giving his reason why they didn't follow up. He can give his reason.

MR. GOSS: Okay. As opinion, but not as fact.

THE WITNESS: We had had a discussion and believed that he had mixed up the position of the cars, based on other witness' statements in direction [sic] that they left. The descriptions he gave to the people that exited the cars were consistent with those of the defendant coming out of – he had flipped flopped them. That's what he had done. But the people come [sic] from the right sides of the streets. He's describing the defendant and another subject coming from the west side of the street, Carlos Munoz and Ben

9

> Callaway coming from the east side of the streets, but he just flipped flopped the cars. So that's why we didn't go back and reinterview anyone.

Reporter's Transcript on Appeal (RT) at 766-68. Petitioner argues that the officer's testimony that Chavira had simply "mixed up the cars" is an "excuse" that "makes absolutely no sense" and is not consistent with other evidence in the case. ECF No. 1 at 11. He points out that Chavira was only ten feet away from the shooter at the time he was shot and, presumably, would not have been mistaken as to the sequence of events at the crime scene. *Id.* at 11, 37.

Petitioner also contends that the police coerced Ben Callaway to testify that petitioner was the shooter. He states that Callaway initially "refused to lend support to Mr. Munoz's version of events," but then changed his story because of police harassment. *Id.* at 12. As described by the California Court of Appeal, Munoz testified at trial that petitioner arrived at his house after the shooting and admitted that he had shot someone. Callaway told detectives about this meeting in his second police interview. However, Callaway testified at petitioner's trial that after he let Carrillo and petitioner in the house he immediately went back upstairs without talking to them. When impeached with his second police interview, Callaway claimed he told the detectives only what he had learned from Munoz and Detective Silva. Callaway also testified at trial that he told one of the interrogating police officers "whatever he wants to hear" because this officer was threatening to make Callaway "his own personal project" and was telling people that Callaway was "an accessory to murder." *Id.* at 13, 47; RT at 681. In addition, he testified as follows:

> Q. And it's your belief that if you don't tell him what he wants to hear, he's going to have you arrested; isn't that true?
>
> A. Well, yeah. That's pretty much the idea that Detective Silva had given me . . .

RT at 680.[6]

/////

---

[6] The California Court of Appeal noted that there was no police officer by the name of Detective Silva working in the San Joaquin Sheriff's Department at the time of the events in question. *Olivarez*, 2012 WL 243196, at *2. However, petitioner provides evidence that the Stockton Police Department may have been assisting the Sheriff's Department in this case and that there is a Detective Silva working for the Stockton Police Department. ECF No. 1 at 52.

10

Petitioner argues that even if Callaway's testimony was not the product of police harassment and coercion, "this in no way provides an adequate explanation as to why Efren Chavira 'positively identifies' the shooter exiting the Mercedes . . . with a gun in his hand." ECF No. 1 at 15. Petitioner contends that the police simply ignored evidence that conflicted with the story told by Munoz because they placed unwarranted trust in Munoz, their "informant." *Id.* at 16. He argues that the police "took the unsupported word of the informant who was also identified as being the shooter." *Id.* at 17.

Petitioner also claims that Munoz admitted to being the shooter when interviewed by a detective. Quoting from the transcript of the interview, petitioner argues that Munoz made a "Freudian slip" by saying "I was already firing." ECF No. 1 at 17. The transcript of the interview shows the following colloquy:

> Q: When you got to the car, where is Ruben [Carrillo] and Cochino [nickname for petitioner, Olivarez[7]]?
>
> A: I don't know. I didn't see. I didn't pay attention. I just ran, sir.
>
> Q: You ran?
>
> A: Yeah.
>
> Q: When you ran this way –
>
> A: I know for a fact I seen Cochino with the gun.
>
> Q: At what point did you see Cochino with the gun?
>
> A: When I was running.
>
> Q: Okay. You are running to the driver's side of your car?
>
> A: The reasons I seen him is 'cause when I started running, he came – 'cause these guys started running.
>
> Q: They started running?

/////

/////

---

[7] Clerk's Transcript on Appeal (CT) at 533.

11

1  A:  They started first.  'Cause I guess they must have seen the gun before he
2  started firing and then when they started running, Cochino came this way and I
3  was already firing.

CT at 540-541.

Petitioner notes that Munoz was cross-examined about that statement and specifically asked why he used the term "firing." ECF No. 1 at 17. Munoz testified that he misspoke and actually meant to say that he was already "running" and not "firing."[8] Reporter's Transcript on Appeal (RT) at 526-27. Petitioner argues that "the more likely truthful version of events was that Mr. Munoz admitted to the shooting." ECF No. 1 at 18.

Petitioner points to other perceived discrepancies in the trial testimony in an attempt to provide support for his argument that the evidence showed Munoz, and not he, was the shooter. For instance, Munoz testified that petitioner told him he was the shooter. Petitioner notes that Efren Chavira testified the shooter had his face covered. Petitioner asks, "Why would petitioner go through the trouble of hiding his identity and then go out of his way to drive to Mr. Munoz's house to tell Mr. Munoz that he (petitioner) was the shooter?" *Id.* at 18-19. Petitioner argues, "simply put, none of what Mr. Munoz claims to have happened makes any sense whatsoever." *Id.* at 19-20.

In essence, petitioner contends that the testimony of Mr. Munoz and Mr. Callaway was not credible, and therefore did not constitute sufficient evidence to support his convictions. He argues, "when this Honorable Court reviews Petitioner's case under the standard of review set forth by the High Court in *Jackson v. Virginia, supra,* it will be more than clear that Petitioner, based on the accuracy of the identification provided by Efren Chavira, simply could not have been the shooter." *Id.* at 22.

/////
/////

---

[8] Munoz was cross-examined at length about his use of the word "firing" rather than running (RT at 526-28) yet the jury ultimately appears to have credited his testimony that it was petitioner who fired the shots.

12

### 1. **Applicable Legal Standards**

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318). Put another way, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, ___ U.S. ___, 132 S.Ct. 2, *4 (2011). Sufficiency of the evidence claims in federal habeas proceedings must be measured with reference to substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16.

In conducting federal habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution." *Ngo v. Giurbino*, 651 F.3d 1112, 1115 (9th Cir. 2011). "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, ___ U.S. ___, 132 S.Ct. 2060, 2064 (2012) (per curiam) (citation omitted). "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir.1995) (citation omitted).

"A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Because this case is governed by the AEDPA, this court owes a "double dose of deference" to the decision of the state court. *Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) (quoting *Boyer v. Belleque*, 659 F.3d 957, 960 (9th Cir. 2011), *cert. denied* ___ U.S. ___, 132 S.Ct. 2723 (2012)). *See also Johnson*, 132 S.Ct. at

1  2062 ("*Jackson* claims face a high bar in federal habeas proceedings because they are subject to
2  two layers of judicial deference.").

### 2. **Analysis**

After reviewing the record in the light most favorable to the jury's verdict, this court concludes that there was sufficient evidence introduced at petitioner's trial to support his convictions for murder and attempted murder, even though there was conflicting evidence regarding the location and description of the shooter. If the record supports conflicting inferences, the reviewing court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (per curiam) (quoting *Jackson*, 443 U.S. at 326). In evaluating the evidence presented at trial, this court may not weigh conflicting evidence or consider witness credibility. *Wingfield v. Massie*, 122 F.3d 1329, 1332 (10th Cir. 1997). Instead, as noted above, the court must view the evidence in the "light most favorable to the prosecution," *Jackson*, 443 U.S. at 319.

Juries have broad discretion in deciding what inferences to draw from the evidence presented at trial. This court may not "impinge[ ] on the jury's role as factfinder," or engage in "fine-grained factual parsing." *Johnson*, 132 S.Ct. at 2065. As the U.S. Court of Appeals for the Ninth Circuit has explained, "[t]he relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991). Under *Jackson*, the court need not find that the conclusion of guilt was compelled, only that it rationally could have been reached. *Drayden v. White*, 232 F.3d 704, 709-10 (9th Cir. 2000).

Here, Callaway and Munoz testified that Ruben Carrillo and petitioner came to Munoz's apartment after the altercation. Munoz testified that petitioner admitted he shot someone. *See* RT at 450, 454, 632-34. Callaway told detectives during a pre-trial interview that he was present during the conversation where petitioner admitted to being the shooter. *Olivarez*, 2012 WL 243196 at *2, n.3. The tape of Callaway's police interview where he made this statement was played for the jury. RT at 650-52. The jury was entitled to rely on that evidence to find

14

petitioner guilty, even though there was other evidence that cast some doubt on the identity of the shooter and the reliability of Callaway's trial testimony. In other words, which version of the events was true was up to the jury alone to decide. *Johnson*, 132 S.Ct. at 2064. The jury evaluated the conflicting evidence in this case and the witnesses' credibility and reached a guilty verdict. Based on the facts introduced at petitioner's trial, a reasonable juror could have concluded beyond a reasonable doubt that petitioner was the person who carried and shot the firearm.

Although petitioner claims that Munoz's testimony was "false" and that Munoz was an "informant," there is no evidence of that in the record. There is also no substantial evidence that the police knew any of the trial testimony was false or that Callaway's trial testimony was coerced. In short, the decision of the California Supreme Court that a rational trier of fact could have found beyond a reasonable doubt that petitioner was guilty of murder and attempted murder is not an unreasonable application of *In re Winship* and *Jackson* to the facts of this case. Accordingly, petitioner is not entitled to federal habeas relief on this claim.[9]

### B. Ineffective Assistance of Appellate Counsel

In his second ground for relief, petitioner claims that his appellate counsel rendered ineffective assistance in failing to raise a claim that that the evidence was insufficient to support petitioner's convictions for murder and attempted murder. ECF No. 1 at 22-23. In the traverse, petitioner adds an additional argument that his appellate counsel rendered ineffective assistance in raising a claim on appeal that assumed petitioner was the shooter. ECF No. 21 at 24-26. With regard to this second argument, petitioner contends, "arguing against the client in and of itself, especially here, where the evidence of guilt is less than compelling most certainly suggests that counsel's performance was unprofessional within the first prong of the *Strickland* test." *Id.* at 25.

---

[9] In the traverse, petitioner argues that the decision of the California Supreme Court on his claim of insufficient evidence is not entitled to deference under AEDPA because the Supreme Court failed to hold an evidentiary hearing on the identity of the shooter. ECF No. 21 at 6. Assuming arguendo that the California Supreme Court erred in failing to hold an evidentiary hearing, petitioner is not entitled to relief on this claim. He has failed to show that the evidence introduced at his trial was insufficient to support his convictions, even under a de novo standard of review.

### 1. Legal Principles: Ineffective Assistance of Counsel

The applicable legal standards for a claim of ineffective assistance of counsel are set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a *Strickland* claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." *Id.* at 687. Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." *Id.* at 687–88 (internal quotation marks omitted). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 131 S.Ct. at 787-88 (quoting *Strickland*, 466 U.S. at 687).

A reviewing court is required to make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 669; *see Richter*, 131 S.Ct. at 789. Reviewing courts must also "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. This presumption of reasonableness means that the court must "give the attorneys the benefit of the doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." *Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388, 1407 (2011) (internal quotation marks and alterations omitted).

Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S.Ct. at 792. A reviewing court "need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697.

/////

The Strickland standards apply to appellate counsel as well as trial counsel. *Smith v. Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989). In order to establish prejudice in this context, a petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on appeal. *Id.* at 1434 n.9.

### 2. Analysis

For the reasons set forth above, petitioner's claim that the evidence was insufficient to support his convictions for murder and attempted murder lacks merit. Accordingly, his appellate counsel did not render ineffective assistance in failing to raise the claim on appeal. An attorney's failure to raise a meritless claim on appeal does not constitute ineffective assistance of counsel. *Jones v. Smith*, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (citing *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985)). *See also Rhoades v. Henry*, 638 F.3d 1027, 1036 (9th Cir. 2011) (counsel did not render ineffective assistance in failing to investigate or raise an argument on appeal where "neither would have gone anywhere"); *Matylinsky v. Budge*, 577 F.3d 1083, 1094 (9th Cir. 2009) (counsel's failure to object to testimony on hearsay grounds not ineffective where objection would have been properly overruled); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("the failure to take a futile action can never be deficient performance").

One of the claims raised by petitioner's appellate counsel was that the trial court violated state law in failing to instruct the jury that the testimony of Munoz and Carillo should be viewed with caution because they were petitioner's accomplices as a matter of law. Resp't's Lodg. Doc. 10 at 11. Contrary to petitioner's argument, this claim would not have caused the appellate court to conclude that petitioner was the shooter in this case. Appellate counsel's decision to raise this claim does not constitute deficient performance and did not result in prejudice. In addition, as an indigent defendant movant did not have a constitutional right to compel his appointed appellate counsel to press nonfrivolous points when that counsel, as a matter of professional judgment, decided not to present those issues. *See Jones v. Barnes*, 463 U.S. 745, 751–54 (1983) (an experienced attorney knows the importance of "winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues"). "A brief that raises every colorable issue runs the risk of burying good arguments." *Id.* at 753.

Movant's appellate counsel raised several claims on appeal with more merit than a claim attacking the sufficiency of the evidence to support his convictions. This court presumes that appellate counsel exercised his professional judgment to raise the issues on appeal that he considered to be the most meritorious. Accordingly, under either a deferential or de novo standard of review, petitioner is not entitled to habeas relief on his claim of ineffective assistance of appellate counsel.

**IV. Conclusion**

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: June 24, 2015.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE